# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                    Case No. 06-CR-328

HOMERO H. HERNANDEZ,

        Defendant.

## ORDER DENYING MOTION TO SUPPRESS
## EVIDENCE OBTAINED IN TRAFFIC STOP

On December 12, 2006, a Grand Jury sitting in Milwaukee returned a six-count indictment charging Defendant Homero H. Hernandez with conspiracy to distribute cocaine and marijuana in the Green Bay area, along with several counts of delivery and possession with intent to deliver in violation of Title 18, United States Code, Section 841. Following his arraignment, Hernandez filed a motion to suppress evidence obtained and statements he allegedly made following a traffic stop on the ground that the stop was illegal. Hernandez also moved to suppress the statements he allegedly made after his arrest on the ground that the investigating officers had violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). An evidentiary hearing on the motions was set for January 24, 2007. Prior to the hearing, the government informed the court that it would stipulate that it would not be using any statements given by the defendant following the administration of *Miranda* warnings at the Green Bay Police Station. The evidentiary hearing therefore addressed only the stop.

## THE EVIDENCE

The government presented testimony from two witnesses to support its contention that the initial stop of Hernandez was lawful. First, Special Agent Michael Sasse of the Wisconsin Department of Justice, Narcotics Bureau, testified that on November 16, 2006, he met with an individual who had apparently become a confidential informant after cocaine was found in his home earlier that day. The informant, who was referred to as CI #1, identified his cocaine and marijuana supplier as Tony Hernandez. CI #1 said he had purchased marijuana from Hernandez approximately five days earlier and told SA Sasse how much he had purchased and where it was located. SA Sasse proceeded to the residence where CI #1 said the marijuana he purchased from Hernandez was located, and proceeded to search. The marijuana was found in the exact quantity and location where CI #1 said it would be found. In addition, the owner of the residence where the marijuana was found, CI #2, identified Tony Hernandez as his supplier as well.

CI #1 told SA Sasse that he had been purchasing marijuana and cocaine from Hernandez for more than a year. He said he bought cocaine from Hernandez at least once per month in half kilo quantities and occasionally up to a full kilogram. CI #1 described Hernandez as a 35- to 40-year-old male Hispanic who was affiliated with the El Rodeo bar on north Baird Street and drove a large black Ford F-150 Supercrew pick-up truck. According to CI #1, Hernandez had delivered cocaine to him at numerous locations, including Hernandez' residence, restaurants, bars, wherever Hernandez happened to be. Hernandez would either make the delivery himself or have a third party make the delivery. CI #1 told SA Sasse that his most recent drug purchase from Hernandez had been for thirty pounds of marijuana, which he picked up at a farmhouse on Eaton Road just outside Green Bay. He said he had met Hernandez at the El Rodeo bar, and Hernandez directed him to the

farmhouse on Eaton Road. When he arrived, CI #1 said he recognized an individual who had made previous cocaine deliveries to him on behalf of Hernandez. CI #1 said that while he waited outside, Hernandez went into the house. When he returned, a garage door on the residence partially opened and someone inside pushed the package containing marijuana outside.

After this initial interview, SA Sasse had CI #1 take him to Tony Hernandez' residence. CI #1 directed SA Sasse to 813 13th Avenue in the City of Green Bay. SA Sasse knew from previous vehicle registration checks at the El Rodeo bar that the black Supercrew F-150 pick-up truck that CI #1 described was registered to a Homero Hernandez who lived at 813 13th Avenue in Green Bay. From this, SA Sasse concluded that Tony Hernandez and Homero Hernandez were most likely the same person. SA Sasse then had CI #1 show him the farmhouse on Eaton Road where the most recent marijuana delivery had occurred. When they arrived at approximately 5:00 p.m., CI #1 identified a vehicle parked at the residence as an Audi that Hernandez' assistant had used on two previous half-kilo cocaine deliveries. Shortly thereafter, a black F-150 Supercrew pick-up truck, which CI #1 identified as Hernandez' truck, arrived and pulled into the driveway of the farmhouse and parked in front of the garage. SA Sasse observed a male Hispanic who CI #1 said "sure looked like" Hernandez exit the truck and enter the house. As he continued to observe, SA Sasse saw the garage door go up two to three feet and then close. Shortly thereafter, the driver came out of the house, got into the truck and drove away. By that time, SA Sasse had verified from the truck's license plate that it was Homero Hernandez' vehicle. Based on this fact and CI #1's opinion that there was a 99% likelihood that Hernandez had just picked up a shipment of drugs, other law enforcement officers who were conducting surveillance were directed to conduct a stop of the vehicle. Later, when the vehicle finally was stopped, SA Sasse drove by and CI #1 identified the driver as the person from whom he had been purchasing cocaine and marijuana over the past year.

3

The other law enforcement officers who were conducting surveillance did not immediately attempt to pull Hernandez' vehicle over after he left the farmhouse. The second witness called by the government was Lieutenant Jude Trimberger of the Green Bay Police Department. Lt. Trimberger, who was assigned to the Brown County Drug Task Force, was assisting with surveillance on November 16, 2006, and followed Hernandez in an unmarked squad as he left the Eaton Road farmhouse. Lt. Trimberger, who had previously been a traffic officer with the Green Bay Police Department, testified that Hernandez maintained a speed of 42 mph as he drove into the City on Main Street, even though the posted speed limit dropped from 45 mph to 35 mph. In addition, Lt. Trimberger testified that he observed Hernandez deviate from his traffic lane on at least two occasions as he entered the City. Based on his observations, Lt. Trimberger advised another undercover officer who was in communication with a marked squad that there were grounds for a traffic stop. The other officer passed on the instructions to the marked squad, and at 5:28 p.m. Hernandez was pulled over and directed to park in a K-Mart parking lot.

Lt. Trimberger immediately approached Hernandez and advised him that he had observed his lane deviations and suspected that he might be driving while impaired. According to Trimberger, Hernandez admitted the deviations, stating he was on the phone or making notes. Trimberger also observed that Hernandez' eyes appeared bloodshot. When Trimberger commented on it, Hernandez responded that he had been working long hours. Lt. Trimberger testified that he nevertheless suspected that Hernandez might be driving under the influence of a controlled substance in violation of Wisconsin law and had the uniformed officer initiate field sobriety tests. Within fifteen minutes, and while Hernandez was still performing the field sobriety tests, another Green Bay police officer with a trained drug detection canine arrived and circled Hernandez' truck. The dog alerted near the driver's side door. When Lt. Trimberger informed Hernandez of the dog's

4

alert, Hernandez admitted that he had some marijuana in the back seat and consented to a search. The marijuana was retrieved and, at that point, Lt. Trimberger instructed the uniformed officer to take Hernandez into custody.

Hernandez also testified at the evidentiary hearing. He testified that when he was pulled over, a uniformed officer approached him first and advised him he was stopped because he swerved between the lines. According to Hernandez, the officer initially said nothing about speeding. While he admitted he may have swerved a little before he was pulled over, Hernandez did not believe his wheels went into the other lane. After the uniformed officer took his license and returned to his squad car, Hernandez testified that Lt. Trimberger appeared and told him he was an off-duty officer and that he was concerned that Hernandez might be driving while impaired. Hernandez denied that he had been drinking and asked why he was really stopped. The uniformed officer told him he was stopped because he was swerving and speeding. He was then told to exit his vehicle and began the field sobriety tests. While he was performing the field sobriety tests, he saw the police dog arrive, but did not think the dog alerted on his truck. He nevertheless admitted he had marijuana in the back seat in response to the undercover officer's question because he thought they would search anyway. When asked if they could retrieve the marijuana from his truck, Hernandez responded, "Yeah, I guess." When the marijuana in his truck was found, he was then placed under arrest. Later at the police station, he was given a citation for lane deviation.

## DECISION

Hernandez has moved for the suppression of the physical evidence obtained and the statements made by him following the stop of his vehicle by police on November 16, 2006. He contends that, because the stop was without probable cause to believe he had committed a crime,

5

the evidence obtained by police must be suppressed under the Fourth Amendment, which generally prohibits unreasonable searches and seizures. *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) ("The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'") (*quoting Terry v. Ohio*, 392 U.S. 1, 19 (1968)). Since police were acting without a warrant, the prosecution carries the burden of proof on the issue of whether the stop of the vehicle was lawful. *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971).

In its effort to meet its burden, the government offers two justifications for the stop of Hernandez' vehicle: (1) there was probable cause to believe Hernandez was CI #1's supplier of controlled substances; and (2) there was probable cause to believe that Hernandez had committed two traffic violations, speeding and unsafe lane deviation. Either justification, the government contends, is sufficient, and Hernandez' motion should therefore be denied.

I agree. Based on the evidence presented, I find that law enforcement officers acted reasonably in performing a traffic stop on Hernandez' vehicle on November 16, 2006, and eventually placing him under arrest. At the outset, I note that police need not have probable cause to believe the driver has committed a crime before conducting a traffic stop; to justify a brief investigatory stop, it is enough if they have a reasonable suspicion that the individual has committed, is committing or is about to commit, a crime. *Terry v. Ohio*, 392 U.S. 1 (1968); *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984). Here, police had more than a reasonable suspicion before the decision was made to pull over Hernandez' vehicle. Based on the information provided by CI #1 and, to a lesser extent, by CI #2, police had probable cause to believe that Hernandez had been selling cocaine and marijuana in the Green Bay area for more than a year.

6

The government relies on *Illinois v. Gates*, 462 U.S. 213 (1983), to support its contention that the information provided by CI #1 was sufficient to establish probable cause that Hernandez had been selling drugs. It notes that in *Gates* the Supreme Court held that a highly detailed tip from an anonymous informant that was corroborated by independent police work could establish probable cause. *Id.* at 246. But this case differs from *Gates* in that the informant is not anonymous, merely confidential. The distinction is significant. An anonymous informant is one whose identity is unknown, even to law enforcement. A confidential informant, on the other hand, is one whose identity is known to law enforcement but is kept confidential, at least initially, so as to maintain the informant's effectiveness or protect him or her from retaliation. A confidential informant who provides false information can be exposed and charged with obstructing an officer, or worse. An anonymous informant who spreads lies is untouchable. It is for this reason that a substantial amount of corroboration is required in order for information provided by an anonymous informant to support a finding of probable cause. *See, e.g., Gates*, 462 U.S. at 243-44. But when a law enforcement officer receives information from a confidential informant, he will often have additional bases upon which to evaluate the reliability of the information provided.

In *United States v. Harris*, 403 U.S. 573 (1971), for example, the Court found information provided by an unnamed informant sufficiently credible to support a finding of probable cause, even though the affidavit disclosed no prior history of the informant providing reliable information. In that case, the confidential informant had admitted that he had been purchasing illicit liquor from the defendant over a long period of time. The fact that his own statements implicated the informant in further criminal activity provided sufficient indicia of reliability to support issuance of a warrant:

7

Common sense in the important daily affairs of life would induce a prudent and disinterested observer to credit these statements. People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search. That the informant may be paid or promised a 'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct. Concededly admissions of crime do not always lend credibility to contemporaneous or later accusations of another. But here the informant's admission that over a long period and currently he had been buying illicit liquor on certain premises, itself and without more, implicated that property and furnished probable cause to search.

403 U.S. at 583-84. In this case, as in *Harris*, the information provided by the confidential informant was against his own interest. CI #1 admitted to receiving substantial amounts of cocaine and marijuana from Hernandez for more than a year. He even informed SA Sasse about a recent delivery of marijuana Hernandez had made to him and told him where it would be found. CI #1's admissions implicated him in far more crimes than he was facing from the cocaine police caught him with on November 16.

The fact that CI #1 may have been promised a break on the charges he was facing in return for his assistance in apprehending his supplier "does not eliminate the residual risk and opprobrium of having admitted criminal conduct." *Id.* at 484. If anything, it means CI #1 had a strong incentive to tell the truth about who was selling him drugs. For unless he was able to provide law enforcement with information that would assist in their investigation, the likelihood of his receiving any consideration on his own charges was negligible. The information he provided would have to bear fruit in order for it to benefit him. CI #1 was therefore in a far different position from a person who is not facing charges and may be acting on motivation known only to himself.

The reliability of the information provided by CI #1 was further enhanced by the events that unfolded as CI #1 pointed out the farmhouse where the most recent marijuana delivery had

8

occurred. As they were leaving the area, CI #1 saw the distinctive truck that Hernandez drove on previous transactions and SA Sasse followed it as it pulled into the driveway of the farmhouse and parked near the garage. After the driver, who CI #1 said "sure looked like" Hernandez, entered the residence, the garage door was partially raised and then lowered, just as CI #1 said it was when Hernandez directed him to that location for a delivery of marijuana only five days earlier. In addition, CI #1 identified another vehicle parked in the driveway as one that had been used by an individual who had made two previous cocaine deliveries to CI #1 on behalf of Hernandez. Once SA Sasse was able to verify that the truck was Hernandez' through the license plate number, police had more than enough evidence to justify a brief investigatory stop of the vehicle as it left the farmhouse. And once CI #1 positively identified Hernandez as his supplier when they drove by, if not even earlier, police had probable cause to arrest him. Since probable cause to arrest the driver of a vehicle justifies a search of the vehicle as well, the search of Hernandez' truck was lawful even without his consent, his admission that he had marijuana, or the alert by the trained drug-detecting canine. *See New York v. Belton*, 453 U.S. 454 (1981) (holding that when a law enforcement officer has made a lawful custodial arrest of the occupant of a motor vehicle, he may, as a contemporaneous incident of that arrest, search the passenger compartment of the vehicle and any container found within the passenger compartment).

I also find from the evidence before me that at the time Hernandez was pulled over, police had probable cause to believe that he was speeding and had unsafely deviated from his lane. Hernandez does not seriously contest Lt. Trimberger's account of his driving as he proceeded into the City after he left the farmhouse. As to the question of whether he was speeding, he merely states he was traveling with the flow of traffic. And as to the lane deviations, Hernandez admits he was

9

using his phone and may have been making notes, but claims he did not believe his wheels went into the other lane. Hernandez argues instead that the alleged traffic violations were not the real reason he was stopped, but were only a pretext.

The fact that police may have been actually motivated by their suspicion that Hernandez had just picked up a drug shipment, however, does not make the stop unlawful as long as there was probable cause to believe he committed a traffic violation. *See Wrehn v. United States*, 517 U.S. 806, 813 (1996) (rejecting argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved). Since there was probable cause to believe he was speeding and deviated from his lane of traffic, I conclude that, for this reason as well, the initial stop of Hernandez was lawful.

Once a lawful traffic stop is made, police may continue the detention no longer than reasonably necessary to accomplish its purpose. *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). For the typical traffic law violation, this should be no longer than it takes to run a check on the individual's license and vehicle registration, and issue a warning or citation. But in this case, Lt. Trimberger observed that Hernandez' eyes appeared bloodshot. This observation, combined with the unsafe lane deviations he had observed and the fact that there was reason to believe Hernandez was involved with drugs, led Lt. Trimberger to conclude that Hernandez might be driving while impaired. He therefore directed the uniformed officer to have Hernandez perform field sobriety tests. Since most controlled substances, including cocaine, do not have a strong odor, the fact that Hernandez did not smell of an intoxicant was of no significance. And since they cannot be detected on a person's breath with a portable breath test (PBT), it made no sense to administer one as Hernandez requested. I conclude that, under the circumstances, requesting Hernandez to perform a field sobriety test was reasonable.

While Hernandez was still performing the tests, a trained drug detection canine arrived and alerted on Hernandez' truck, indicating the presence of drugs. The use of drug detection dogs in this manner when it does not prolong the detention has also been upheld by the Supreme Court. *See Illinois v. Caballes*, 543 U.S. 405 (2005). And when informed of the dog's alert, Hernandez, while yet to be placed in custody, *see Berkemer v. McCarty*, 468 U.S. at 439-40, admitted that he had marijuana in the back seat of his truck and consented to a search. I find Hernandez' admission and his consent to have been voluntary and uncoerced. Thus, even if the evidence of Hernandez' drug dealing was insufficient to justify the stop and subsequent arrest, I find that his initial stop and detention was justified by the traffic violations that Lt. Trimberger observed as he entered the City. Once he was detained, probable cause both for his arrest and the search of his vehicle arose from the canine's alert and his own admission. The search was also lawful to the extent it was based on his consent.

In sum, I conclude that Hernandez was not illegally stopped by law enforcement and that their conduct was reasonable. Accordingly, Hernandez' motion to suppress the evidence obtained and statements made after the stop is denied.

Dated this __15th__ day of February, 2007.


          s/ William C. Griesbach_____
          William C. Griesbach
          United States District Judge